[No. 71855-5. En Banc.]

Argued September 24, 2002.    Decided March 13, 2003.

JOSEPH HICKLE, ET AL., *Respondents*, v. WHITNEY FARMS, INC., ET AL., *Defendants*, SENECA FOODS CORPORATION, ET AL., *Petitioners*.

912

*David M. Jacobi* (of *Wilson, Smith, Cochran, Dickerson*), for petitioner Seneca Foods Corp.

*Theodore L. Preg* and *Jeffrey W. Daly* (of *Preg O' Donnell & Gillett, P.L.L.C.*), for petitioner Milne Fruit Products, Inc.

*Rickey C. Kimbrough* and *Don S. Willner*, for respondents.

CHAMBERS, J. — Today we must determine if those who produce industrial quantities of organic wastes have a duty to comply with chapter 70.105 RCW, the Hazardous Waste Management Act (HWMA). We hold that they do. We, therefore, affirm the Court of Appeals and remand the case to the trial court for further proceedings consistent with this opinion.

## FACTS

On October 24, 1996, 16-year-old Phillip Hickle went quail hunting on land owned by Whitney[1] near Prosser, Washington. Local custom allowed hunting on private property unless it was posted with "No Trespassing" or "No Hunting" signs. Hickle had hunted on Whitney's unposted land before, as had many of his friends. They all believed Whitney permitted hunting on its land. Nothing on the path to the hidden dump site warned of danger.

Hickle, unaware of any peril, stepped into a concealed pit of burning industrial organic wastes and was severely injured. More than half of his body was burned, and he lost both legs below the knee and lost partial use of one hand. Amazingly, he was able to pull himself to safety. Hickle spent nearly nine months at Harborview Medical Center and Children's Hospital & Regional Medical Center in Seattle, Washington.

For many years, the fruit juice producers Seneca Foods Corporation and Milne Fruit Products, Inc., contracted with Whitney to haul away and dispose of industrial quantities of organic wastes generated by their businesses. Whitney used its lands to dispose of these wastes in large pits

---

[1] Whitney is not a party before this court, having already settled with Hickle. Whitney, Whitney Brothers, Inc., and Whitney Farms, Inc., will all be referred to as "Whitney."

covered with soil. The surface of these pits appeared normal, concealing masses of decomposing materials that reached temperatures as high as 507 degrees Fahrenheit.

The industrial organic wastes consisted of fruit pomace and spent diatomaceous earth (DE).[2] Fruit pomace is a by-product of fruit juice production, and consists of the skin, seeds, and other portions of the fruit left over after juice is extracted. It can be used as mulch, animal feed, or a soil conditioner. DE is a filter material, mostly consisting of silica dioxide. By itself, it is biologically inert. Spent DE contains organic matter collected during the filtering process. Although we refer to the wastes as organic, there is unrebutted testimony that the wastes do not qualify for agricultural exceptions to disposal regulations because Seneca and Milne hold the wastes for long periods of time at the original disposal site, rather than applying them in agronomic quantities back to the soil. Neither Seneca nor Milne contest that by definition their industrial organic wastes are industrial solid wastes under the solid waste management act (SWMA), chapter 70.95 RCW. Nor do they contest that it is unlawful under RCW 70.95.240 to dispose of industrial solid wastes except in a validly permitted waste disposal site.

The industrial organic wastes which Whitney hauled for Seneca and Milne were mostly disposed of by being buried or piled onto Whitney's lands. Occasionally Seneca required landfill receipts as a condition of payment. There is evidence that Whitney was rarely required to haul Seneca's wastes to licensed landfills. Having its wastes disposed of in a licensed landfill was costly, and Seneca required Whitney to "make every reasonable effort to protest any governmentally forced change to disposal location." Clerk's Papers (CP) at 255. Seneca paid Whitney $15.00 per ton to pile the wastes on Whitney's land, in contrast to $84.00 plus costs

---

[2] Although Milne asserts that it contracted with Whitney to haul away and dispose of only spent DE, there is testimony that Whitney hauled away and disposed of pomace for Milne. We leave it in the able hands of a jury to decide this disputed question of fact.

per "16 yd load" to haul the industrial organic wastes to a licensed landfill. *Id.*

Landfills are licensed and regulated to prevent soil, water, and air pollution, and to minimize the effects of wastes from pests, fires, and pollutants on human health. The management of waste disposal facilities is highly regulated. The Department of Ecology (DOE) includes terms and conditions necessary to protect human health and the environment in the permits issued to landfills licensed to dispose of dangerous wastes. WAC 173-303-800.

Large quantities of decomposing organic material, if not carefully regulated and tended, can spontaneously ignite. This has been known since at least the first century A.D. Spontaneously igniting and continually burning industrial organic wastes was a chronic problem on Whitney's land. For years, Whitney's piles smoked, smoldered, and attracted vermin causing considerable irritation to Whitney's neighbors, who complained vociferously to state and local agencies.

The DOE began putting pressure on Seneca and Milne in 1982 to correct their waste disposal problems. The DOE notified both companies that there had been complaints that their wastes were being disposed of improperly, and repeatedly asked that they dispose of the wastes in a licensed sanitary landfill.

In September 1984, Seneca was issued a waste discharge permit that required it to properly dispose of its organic wastes. Violation of the permit is currently punishable by a fine of up to $10,000 a day. RCW 90.48.144.

In 1985, the Benton-Franklin-Walla Walla Counties Air Pollution Control Authority informed Seneca that "illegally dumped material still belongs to the originator or source until accepted by an approved landfill or disposal site" and advised Seneca that if Whitney did not remediate the problem, Seneca was responsible. CP at 805. The Benton-Franklin District Health Department (Health Department) contacted Whitney directly a few weeks afterward regard-

ing neighbors' complaints of smoke, odor, and smoldering fire.

In 1986, the Health Department contacted Whitney, Seneca and Milne by letter to review the situation. The letter said in part, "[i]t is our position that you illegally dumped this material (by definition a solid waste) on the land in violation of W.A.C. 173-301 (Minimum Functional Standards) without a permit and that the material is contaminating the surface and ground waters in the area with nothing being done to mitigate the situation." CP at 811. The Health Department then directed Whitney to immediately:

1. Remove all deposits of pumice (not the diatomaceous earth) and dispose of it by incorporating it into the soil. This is what you claim will be done with it anyway.

2. Once the pumice is removed, cover the remaining [sic] deposits of diatomaceous earth with six inches or more of topsoil.

3. Resolve with [Washington Department of Ecology] the drainage of the spring source water since that will involve an engineering solution.

CP at 811. Copies of this letter were sent to Seneca and Milne. Three years later, Benton Fire District No. 3 decided that it would not be responsible for "Whitney's illegal dumpground and eternal burning pulp." CP at 1064. In 1992, a Health Department employee surveyed Whitney's waste dump. He later submitted a sworn statement:

I observed the smoldering of the waste resulting from spontaneous combustion and told Seneca and Milne management officials about the smoldering piles of waste. I continued to advise Whitney, Seneca and Milne that solid wastes had to be deposited in a licensed land fill and told Seneca and Milne that as generators of the solid waste they shared in the responsibility of making sure that the solid waste produced from their plants were disposed of in a legal manner.

CP at 455. In 1993, the Health Department again informed Seneca and Milne that they were still responsible for the

proper disposal of their industrial organic wastes. However, in 1994, Whitney was charged, tried by jury, and acquitted of illegally dumping wastes.

By November 1994, Seneca's contract with Whitney specifically required Whitney to comply with all applicable laws and regulations, and Seneca retained the right to clean up any spills or illegally dumped wastes at Whitney's expense.[3] Under this contract, Seneca occasionally required Whitney to show receipts from a landfill as a condition of being paid. However, the Health Department continued to receive and communicate to the companies neighbors' complaints about smoldering wastes. The smoldering pits of organic waste remained a hazard in late 1996 when Hickle was injured while hunting on the property.

Hickle brought suit against Whitney, Seneca, and Milne for personal injury under a variety of theories. Whitney settled. Hickle proceeded against Seneca and Milne alleging in part violation of statutory duties imposed by the SWMA and the HWMA and common law negligence. The trial court granted summary judgment in favor of Seneca and Milne.

The Court of Appeals reversed summary judgment on the HWMA and common law claims. It also affirmed the trial court's dismissal of claims based on the SWMA, ruling that the SWMA does not create a private cause of action. Hickle does not seek review of that holding.

Seneca timely sought review, and Milne belatedly filed an "answer" joining Seneca in seeking review and adding new issues. We granted review.

---

[3] The contract stated:

In the event that DE is spilled or deposited illegally on any property, due to a failure of [Whitney] to perform any of its obligations hereunder, [Whitney] shall either perform the necessary clean up within six (6) hours of notice or *Seneca may perform the necessary clean up and charge to [Whitney] the actual costs of clean up plus the sum of* One Hundred Dollars *($100.00) per day as liquidated damages.*

CP at 255-56 (emphasis added).

## ANALYSIS

The case comes to us on summary judgment. Review is de novo, with all reasonable inferences taken in favor of Hickle, the nonmoving party. *Berger v. Sonneland,* 144 Wn.2d 91, 102-03, 26 P.3d 257 (2001).

## STATUTORY DUTY CLAIM

■ The HWMA explicitly creates a private cause of action.[4] If Hickle can establish (1) that Seneca and Milne violated the HWMA or its implementing regulations and (2) that their violations caused Hickle's injuries, then Hickle may recover his damages from Seneca and Milne. *See* RCW 70.105.097.

■■ Petitioners argue that they did not have a duty to dispose of their wastes in accordance with the HWMA because fruit pomace and spent DE were not specifically "designated" as "dangerous wastes" by the DOE. Their argument fails to recognize that as generators[5] of solid waste[6] they have a duty to determine whether or not their wastes are regulated by the HWMA. The regulations imple-

---

[4]
A person injured as a result of a violation of this chapter or the rules adopted thereunder may bring an action in superior court for the recovery of the damages. A conviction or imposition of a penalty under this chapter is not a prerequisite to an action under this section.

The court may award reasonable attorneys' fees to a prevailing injured party in an action under this section.
RCW 70.105.097.

[5]
"Generator" means any person, by site, whose act or process produces dangerous waste or whose act first causes a dangerous waste to become subject to regulation.
WAC 173-303-040.

[6]
(3) Definition of solid waste.

(a) A solid waste is any discarded material that is not excluded by WAC 173-303-017(2) or that is not excluded by variance granted under WAC 173-303-017(5).
WAC 173-303-016(3)(a).

menting the HWMA require "any person who generates a solid waste (including recyclable materials)" to follow the proscribed procedures for determining whether or not their solid waste is designated as dangerous waste. WAC 173--303-070(1)(b).[7] "Designated" is a term of art.

The legislature defined "dangerous wastes" as:

> any discarded, useless, unwanted, or abandoned substances . . . which are *disposed of in such quantity* or concentration as to pose a substantial present or *potential hazard to human health*, wildlife, or the environment because such wastes or constituents or combinations of such wastes:
>
> . . . .
>
> (b) [a]re . . . flammable . . . .

RCW 70.105.010(5) (emphasis added). The DOE has promulgated a four-step procedure that generators of solid wastes must follow to determine if their solid waste is a designated dangerous waste. WAC 173-303-070(3)(a)-(b).[8]

---

[7]

**Designation of dangerous waste.** (1) Purpose and applicability.

(a) This section describes the procedures for determining whether or not a solid waste is [dangerous waste] or [extremely hazardous waste].

(b) The procedures in this section are applicable to any person who generates a solid waste (including recyclable materials) that is not exempted or excluded by this chapter or by the department. *Any person who must determine whether or not their solid waste is designated must follow the procedures set forth in subsection (3) of this section. Any person who determines by these procedures that their waste is designated [dangerous waste] or [extremely hazardous waste] is subject to all applicable requirements of this chapter.*

WAC 173-303-070(1)(a)-(b) (emphasis added).

[8]

(3) Designation procedures.

(a) To determine whether or not a solid waste is designated as a dangerous waste a person must:

(i) First, determine if the waste is a listed discarded chemical product, WAC 173-303-081;

(ii) Second, determine if the waste is a listed dangerous waste source, WAC 173-303-082;

(iii) Third, if the waste is not listed in WAC 173-303-081 or 173-303-082, or for the purposes of compliance with the federal land disposal restrictions as adopted by reference in WAC 173-303-140, *determine if the waste exhibits any dangerous waste characteristics*, WAC 173-303-090; and

The first two steps require generators of solid wastes to consult two lists and determine if their wastes are specifically listed as dangerous wastes. WAC 173-303-070(3)(a)(i), (ii). If the waste is not a specifically listed dangerous waste, then the generator must move to step three and determine if the waste exhibits any dangerous waste characteristics. WAC 173-303-070(3)(a)(iii). Finally, if the waste does not exhibit any dangerous waste characteristics, the generator must move to step four and determine if the waste meets any dangerous waste criteria. WAC 173-303-070(3)(a)(iv).

"Ignitability" is a dangerous waste characteristic. WAC 173-303-090(5). A solid waste is ignitable if it "is capable, under standard temperature and pressure, of causing fire through . . . spontaneous chemical changes and, when ignited, burns so vigorously and persistently that it creates a hazard." WAC 173-303-090(5)(a)(ii). "A solid waste that exhibits the characteristic of ignitability *must* be designated [dangerous waste] . . . ."[9] WAC 173-303-090(5)(b) (emphasis added).

██ Hickle has presented unrebutted expert testimony establishing that the accumulation[10] of industrial quantities of fruit pomace and spent DE can spontaneously

(iv) Fourth, if the waste is not listed in WAC 173-303-081 or 173-303-082, and does not exhibit a characteristic in WAC 173-303-090, determine if the waste meets any dangerous waste criteria, WAC 173-303-100.

(b) *A person must check each section, in the order set forth, until they determine whether the waste is designated as a dangerous waste.* Once the waste is determined to be a dangerous waste, further designation is not required except as required by subsection (4) or (5) of this section. If a person has checked the waste against each section and the waste is not designated, then the waste is not subject to the requirements of chapter 173-303 WAC.

Any person who wishes to seek an exemption for a waste which has been designated [dangerous waste] or [extremely hazardous waste] must comply with the requirements of WAC 173-303-072.

WAC 173-303-070(3)(a)-(b) (emphasis added).

[9] The regulations use the abbreviation DW for dangerous wastes that are not extremely hazardous wastes (EHW). Because the wastes involved in this matter are not extremely hazardous wastes under the act, the distinction is not relevant to our analysis. Therefore, we will not use the abbreviations.

[10] The regulatory definition of solid waste "includes but is not limited to any material that: Is accumulated, used, reused, or handled in a manner that poses a threat to public health or the environment." WAC 173-303-016(1)(b)(ii). The

combust under standard temperature and pressure[11] due to moisture content and internal chemical changes. The wastes deposited on Whitney's lands actually combusted and burned so vigorously and persistently that the local fire district refused to be responsible for the "eternally burning pulp." CP at 1064. Hickle's injuries underscore the hazard created by improperly tended industrial quantities of organic wastes.

On the record before us, Seneca's and Milne's industrial quantities of organic wastes meet both the legislative and regulatory definitions of dangerous wastes. Contrary to Seneca's claims, there is evidence to support the conclusion that its wastes are designated dangerous wastes according to the specific procedures set forth in the DOE regulations.[12] On the record before us, the wastes were unwanted substances disposed of in such quantities as to pose a potential hazard to human health due to the dangerous

---

statutory definition of dangerous wastes includes materials that may not be presently hazardous but are potentially hazardous to human health. RCW 70.105.010(5).

[11] Standard temperature and pressure are defined by the Department of Ecology (DOE) as 20 degrees Celsius (68 degrees Fahrenheit) and 1 atmosphere of pressure. DOE Publication #97-407, at 8.

[12] Seneca is partially correct that before a waste is designated as a dangerous waste based on the dangerous waste characteristic of ignitability the regulations require a specific procedure and in certain circumstances a specific method of testing be followed. See WAC 173-303-110(3)(c)(i). DOE Publication #97-407 sets forth the methods for determining if a substance has the dangerous characteristic of ignitability. If the question is whether a liquid contained in a solid is ignitable, then the Pensky-Martens Closed Cup Tester or the Setaflash Closed Cup Tester must be followed. WAC 173-303-090(5)(a)(i); DOE Publication #97-407, at 6-8. One of these particular methods is used to determine the liquid's flash point, which is part of the definition of an ignitable liquid contained in solid waste. WAC 173-303-090(5)(a)(i). Neither the WAC nor the DOE Publication #97-407 requires any particular scientific method be followed to determine if a *solid* waste, not a liquid contained in the solid waste, exhibits the characteristic of ignitability. If the solid waste "is capable, under standard temperature and pressure, of causing fire through friction, absorption of moisture or spontaneous chemical changes and, when ignited, burns so vigorously and persistently that it creates a hazard," then it exhibits the characteristic of ignitability. WAC 173-303-090(5)(a)(ii); *see* WAC 173-303-110(3)(c)(i); DOE Publication #97-407, at 8.

waste characteristic of ignitability.[13] *See* RCW 70.105.010(5); WAC 173-303-070(3)(a)(iii), -090(5)(a), (b).

Finally, Seneca argues that the legislature and the DOE simply could not have intended that industrial quantities of organic wastes be designated as dangerous wastes. Seneca reasons that if their industrial quantities of fruit pomace and spent DE are covered by the HWMA and its implementing regulations, then a farmer's hay or corn stored in a barn would also be covered by the HWMA and its implementing regulations. We fail to see any logical or legal analogy between the petitioners' wastes and a farmer's stored crops.

Even if we assume that hay and corn stored in a barn exhibit the dangerous characteristic of ignitability, stored hay and corn would not be covered by the HWMA and its implementing regulations. The HWMA regulates dangerous wastes. *See* RCW 70.105.007, .010(15). No persuasive argument can be made that hay and corn stored in a barn fall under the statutory definition of dangerous wastes because if hay and corn are being stored then they are not "discarded, useless, unwanted, or abandoned substances . . . which are disposed of in such quantity or concentration as to pose a substantial present or potential hazard to human health." RCW 70.105.010(5).

For the foregoing reasons, we hold that the producers of industrial quantities of organic wastes, which are a potential hazard to human health when accumulated in a manner as to exhibit the dangerous characteristic of ignitability, have a duty to comply with the HWMA.[14] On remand, the trier of fact will need to determine (1) if Seneca

---

[13] The case comes to us on summary judgment and the unrebutted testimony is that the wastes were spontaneously combustible under standard temperature and pressure. Seneca and Milne are free to present contrary evidence on remand.

[14] The requirements for a generator of dangerous wastes are set forth in WAC 173-303-170. We note that if producers of industrial quantities of organic wastes, such as Seneca and Milne, wish to avoid these requirements they may petition the DOE for a categorical exemption under WAC 173-303-071(2), or return the wastes to the land in agronomic quantities to avoid the wastes being designated as dangerous under the HWMA.

and Milne violated the HWMA and (2) if they did violate the HWMA, whether their violations caused Hickle's injuries.

We wish, however, to make it clear that nothing in this opinion implies that all wastes, organic or otherwise, are covered by the HWMA. For example, agricultural wastes that are not disposed of in such quantities as to pose a present or potential hazard to human health are not covered by the HWMA because they do not meet the statutory definition of dangerous waste. *See* RCW 70.105.010(5). In addition, the HWMA regulations specifically exempt certain materials from the definition of solid wastes. WAC 173-303-016(1)(b)(i), (5)(a)(ii), -017, -070(2)(b). Furthermore, the regulations specifically exclude certain categories of waste, including agricultural crops and animal manures which are returned to the soil as fertilizers. WAC 173-303-071(3)(d).[15]

## COMMON LAW NEGLIGENCE CLAIM

Seneca and Milne correctly argue that a principal is not generally liable to third parties for the torts of an independent contractor. *See Tauscher v. Puget Sound Power & Light Co.*, 96 Wn.2d 274, 277, 635 P.2d 426 (1981). However, their argument fails to address Hickle's claims that Seneca's and

---

[15] We respectfully disagree with our learned colleague that the HWMA is primarily directed toward the regulation of pesticides. First, we note the legislative declaration of purpose begins: "The health and welfare of the people of the state depend on clean and pure environmental resources unaffected by hazardous waste contamination." RCW 70.105.005(1). Hazardous waste contamination is not limited to pesticides. Second, the legislative definition of dangerous wastes (only one portion of the substances regulated by the act) is explicitly open ended. Our statutory definition reads: " '[d]angerous wastes' means any discarded, useless, unwanted, or abandoned substances, including but not limited to certain pesticides . . . which are disposed of in such quantity or concentration as to pose a substantial present or potential hazard to human health . . . ." RCW 70.105.010(5). Again, this evidences legislative intent to regulate any discarded substances which pose substantial danger to human health, not merely pesticides. Third, the legislative definition of "hazardous waste" extends to "all dangerous and extremely hazardous waste, including substances composed of both radioactive and hazardous components." RCW 70.105.010(15). Again, this extends far beyond pesticides. Finally, the HWMA and its implementing regulations specifically reference many substances that are not used as pesticides. *See, e.g.*, RCW 70.105.105 (transformers and capacitors containing polychlorinated biphenyls (PCBs)); RCW 70.105.050 (radioactive wastes); WAC 173-303-090 (listing specifically regulated substances).

Milne's actions were negligent in their own right and that they are liable for Hickle's injuries under common law principles of negligence.

In his complaint, Hickle made several claims for relief under common law principles of negligence including strict liability, willful and wanton tortious conduct, and negligent entrustment. In his appeal to the court below and upon review by this court, Hickle argued generally that the superior court erred by failing to conclude that Seneca and Milne had a common law duty of reasonable care to dispose of their industrial organic wastes safely. The Court of Appeals did not specifically address this issue. Instead, it held that if certain facts were proved at trial, then Seneca and Milne are not entitled to the insulation normally afforded to a principal of an independent contractor. *Hickle v. Whitney Farms, Inc.*, 107 Wn. App. 934, 943, 29 P.3d 50 (2001). We agree that the trial court needs to resolve remaining material questions of fact before addressing Hickle's common law claims of negligence. However, given our resolution of the statutory claim, we do not reach the reasoning of the court below regarding principals and independent contractors.

■ On remand, the focus must be on the actions of Seneca and Milne. If, for example, Hickle pursues his negligent entrustment claim, then the question for the fact finder is whether Seneca's and Milne's entrustment of industrial quantities of organic wastes to Whitney were negligent acts that proximately caused Hickle's injuries. Negligent entrustment is a "well-established" common law doctrine in Washington. *Christen v. Lee*, 113 Wn.2d 479, 499, 780 P.2d 1307 (1989). It is based on the forseeability of harm when one knew or should have known that the person to whom materials were entrusted was unable to safely handle the materials. *See* RESTATEMENT (SECOND) OF TORTS § 390 (1965); *Bernethy v. Walt Failor's, Inc.*, 97 Wn.2d 929, 933-34, 653 P.2d 280 (1982); *Mejia v. Erwin*, 45 Wn. App. 700, 704-05, 726 P.2d 1032 (1986). In addition, it is not an absolute defense that Whitney may have illegally handled

the wastes because even " 'intervening criminal acts may be found to be foreseeable, and if so found, actionable negligence may be predicated thereon.' " *Bernethy*, 97 Wn.2d at 934 (quoting *McLeod v. Grant County Sch. Dist. No. 128*, 42 Wn.2d 316, 321, 255 P.2d 360 (1953)); *accord Shaffer v. Acme Limestone Co.*, 206 W. Va. 333, 346, 524 S.E.2d 688 (1999).

■ If Hickle can establish (1) that Seneca and Milne entrusted wastes to Whitney, (2) that Whitney was reckless or incompetent to safely handle the wastes, (3) that Seneca and Milne knew or should have known of Whitney's recklessness or incompetence, (4) that Whitney's recklessness or incompetence created an unreasonable risk of harm, and (5) that Hickle's injuries were proximately caused by the negligent entrustment of wastes to Whitney, then Seneca and Milne are liable for his injuries under the theory of negligent entrustment. *See* RESTATEMENT, *supra*, § 390.

The trial court erred by dismissing Hickle's common law claim of negligence under the theory of negligent entrustment because material questions of fact remain unresolved.

## CONCLUSION

Generators of industrial quantities of organic wastes have a duty to comply with the HWMA. Washington courts recognize well established doctrines of common law negligence, such as negligent entrustment. Because material questions of fact remain as to both the statutory duty and common law negligence claims, we affirm the court below and remand the case to the trial court for further proceedings consistent with this opinion.

JOHNSON, IRELAND, and OWENS, JJ., and SMITH, J. PRO TEM., concur.

ALEXANDER, C.J. (concurring in part, dissenting in part) — I concur with the majority's decision to remand this case for trial. I write separately, though, to indicate that I would

remand for a trial only on the plaintiff's common law negligence theory. I must say, however, that I do not agree with the majority's recitation of what must be proved by Hickle to establish negligence. Because, as I indicate hereafter, I disagree with the majority's resolution of the statutory issue, I would not limit the evidentiary issues on remand as does the majority.

As I have just noted, it is my view that the trial court correctly granted a summary judgment dismissing Hickle's claim that the defendants violated a statutory duty. I reach this conclusion because I am satisfied that the organic wastes that were stored on Whitney's property were not "dangerous wastes" under this state's Hazardous Waste Management Act, chapter 70.105 RCW. Dangerous wastes are defined in that act as follows: "[A]ny discarded, useless, unwanted, or abandoned substances, *including but not limited to certain pesticides, or any residues or containers of such substances* which are disposed of in such quantity or concentration as to pose a substantial present or potential hazard to human health, wildlife, or the environment . . . ." RCW 70.105.010(5) (emphasis added). RCW 70.105.010(8) provides that "pesticides" shall have "the meaning of the term as defined in RCW 15.58.030 as now or hereafter amended." RCW 15.58.030(30) indicates that "pesticide"

means, but is not limited to:

(a) Any substance or mixture of substances intended to prevent, destroy, control, repel, or mitigate any insect, rodent, snail, slug, fungus, weed, and any other form of plant or animal life or virus, except virus on or in a living person or other animal which is normally considered to be a pest or which the director may declare to be a pest;

(b) Any substance or mixture of substances intended to be used as a plant regulator, defoliant or desiccant; and

(c) Any spray adjuvant.

The organic wastes here, fruit pomace and spent diatomaceous earth, are obviously not pesticides, pesticide residue or the storage containers within which pesticides

are kept. In short, these wastes are not included in the specific list of dangerous wastes. Although I recognize that because the aforementioned statute contains the phrase, "including but not limited to certain pesticides," substances other than pesticides can fall under the rubric of dangerous wastes. The statute is not, however, as broad in its coverage as the majority would conclude. I say that because of the canon of statutory construction which indicates that

> "where general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned."

*Cockle v. Dep't of Labor & Indus.*, 142 Wn.2d 801, 808, 16 P.3d 583 (2001) (quoting BLACK'S LAW DICTIONARY 517 (6th ed. 1990)); *see generally City of Seattle v. State*, 136 Wn.2d 693, 699, 965 P.2d 619 (1998). Organic substances like fruit pomace or spent diatomaceous earth are clearly not of the same class, kind or type as pesticides, residue of pesticides, or pesticide containers. Thus, they are not dangerous wastes. Hickle should not, therefore, be able to maintain this action against the defendants for allegedly violating the Hazardous Waste Management Act. Because the majority permits that portion of Hickle's cause of action to go forward to trial, I dissent.

MADSEN, SANDERS, and BRIDGE, JJ., concur with ALEXANDER, C.J.